Paul KALMANOVITZ, individually and as a shareholder of Pabst Brewing Company, and S & P Company, a California corporation, Plaintiffs,

v.

G. HEILEMAN BREWING COMPANY, INC., a Wisconsin corporation, Russell G. Cleary, HBC Acquisition, Inc., a Delaware corporation, Pabst Brewing Company, a Delaware corporation, William F. Smith, Jr., Irwin L. Jacobs, Dennis Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay, Defendants.

Paul KALMANOVITZ, an individual, and S & P Company, a California corporation, Plaintiffs,

v.

Irwin JACOBS, an individual, Dennis Mathisen, an individual, Gerald A. Schwalbach, an individual, and Daniel T. Lindsay, an individual, Defendants.

Civ. A. No. 82–797–JLL.

United States District Court, D. Delaware.

June 3, 1985.

Robert K. Payson and Peter M. Sieglaff of Potter, Anderson & Corroon, Wilmington, Del., and Joseph L. Alioto, Joseph M. Alioto, John I. Alioto, and Gary D. Elion of Alioto & Alioto, San Francisco, Cal., for plaintiffs.

R. Franklin Balotti of Richards, Layton & Finger, Wilmington, Del., and Harry Davidow of Weil, Gotshal & Manges, New York City, for defendants Irwin L. Jacobs, Dennis M. Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay.

Bruce M. Stargatt of Young, Conaway, Stargatt & Taylor, Wilmington, Del., Maurice J. McSweeney of Foley & Lardner, Milwaukee, Wis., and Leslie C. Smith of Foley, Lardner, Hollabaugh & Jacobs, Washington, D.C., for defendants G. Heileman Brewing Co., Inc., Russell G. Cleary, and HBC Acquisition, Inc.

A. Gilchrist Sparks, III of Morris, Nichols, Arsht & Tunnell, Wilmington, Del., and Willis B. Snell of Sutherland, Asbill & Brennan, Washington, D.C., for defendants Pabst Brewing Co. and William F. Smith, Jr.

## OPINION

LATCHUM, Senior District Judge.

This action[1] was brought by plaintiffs Paul Kalmanovitz ("Kalmanovitz") and S & P Company, a California corporation[2] (collectively "plaintiffs"), based upon an alleged breach of contract entered into on October 26, 1982, as supplemented by the letter agreement of November 18, 1982, between Kalmanovitz and Messrs. Irwin L. Jacobs ("Jacobs"), Dennis M. Mathisen, Gerald A. Schwalbach and Daniel T. Lindsay (collectively "the Jacobs Group"). Kalmanovitz charges that the Jacobs Group refused to pay him: (1) the contract price of $3,785,812.60 on the November 18, 1982 letter agreement as fifty percent of the price difference between $24 per share and $32 per share on 83 percent of 1,140,305 shares of Pabst tendered; and (2) $3,750,-000 as fifty percent of the $7,500,000 received by the Jacobs Group pursuant to the November 26, 1982 settlement between the Jacobs Group, Heileman Brewing Co. ("Heileman") and Pabst Brewing Co. ("Pabst"). (Docket Item ["D.I."] 41.) Presently before this Court are two motions: (1) the Jacobs Group motion to disqualify Joseph L. Alioto, Esq., and Alioto & Alioto as counsel for plaintiffs (D.I. 189); and (2) plaintiffs' motion for jury trial. (D.I. 186.)

## I. JACOBS GROUP MOTION TO DISQUALIFY COUNSEL FOR PLAINTIFFS

Pursuant to Disciplinary Rules 5–102(A), 5–102(B) and 5–105(D) of the American Bar Association Code of Professional Responsibility, the defendants have moved for an order disqualifying Joseph L. Alioto, Esq., and his law firm from representing the plaintiffs.[3] The defendants contend that

---

1. The underlying facts of the battle for control of Pabst have been set forth in detail in seven prior published opinions, the most recent of which is reported in 595 F.Supp. 1385 (D.Del. 1984).

2. S & P is a California corporation engaged in the business of investments and of owning and managing real estate. Kalmanovitz owns all of its stock. (D.I. 1.)

3. The issue of disqualification as to Joseph L. Alioto, Esq., was raised *sua sponte* by the Court at the final pretrial conference held on March 22, 1985, when it was noted that Mr. Alioto was to be called as a witness. (D.I. 184.)

the testimony of Joseph L. Alioto, Esq., is crucial to the following significant events: (1) the negotiations preceding the November 18, 1982 letter agreement between Irwin L. Jacobs and Kalmanovitz; (2) the drafting of the November 18, 1982 agreement by Mr. Alioto; (3) the events leading up to the November 26, 1982 agreement between the Jacobs Group, Heileman and Pabst. Because it appears that Joseph L. Alioto, Esq., "ought to be called as a witness" for the plaintiffs, defendants argue that Joseph L. Alioto and his firm must be disqualified. (D.I. 190.) Plaintiffs respond by arguing that there is no basis for disqualifying either Joseph L. Alioto, Esq., or his firm because: (1) Mr. Alioto will not be called as a witness for the plaintiffs; (2) should he be called as a witness by the defendants, his limited testimony will be cumulative or relate only to undisputed matters; and (3) disqualification of Mr. Alioto and his firm would create an undue hardship on the plaintiffs. (D.I. 193.)

For the reasons set forth below, Mr. Alioto and his law firm will be disqualified from representing the plaintiffs at trial on the breach of contract claims.

The Code of Professional Responsibility Canons and Disciplinary Rules ("DR") promulgated by the ABA in 1969 and amended in 1970 [4] set forth the circumstances under which an attorney and his firm [5] must withdraw from representation of a client. DR 5–102(A) provides: [6]

> If, after undertaking employment in contemplated or pending litigation, a lawyer learns or it is obvious that he or a lawyer in his firm *ought to be called as a witness on behalf of his client*, he *shall withdraw* from the conduct of the trial and his firm, if any, shall not continue representation in the trial, except that he may continue the representation and he

or a lawyer in his firm may testify in the circumstances enumerated in DR5–101(B)(1) through (4) [which state that a lawyer or his firm may testify:]

> (1) If the testimony will relate solely to an uncontested matter.
>
> (2) If the testimony will relate solely to a matter of formality and there is no reason to believe that substantial evidence will be offered in opposition to the testimony.
>
> (3) If the testimony will relate solely to the nature and value of legal services rendered in the case by the lawyer or his firm to the client.
>
> (4) As to any matter, if refusal would work a substantial hardship on the client because of the distinctive value of the lawyer or his firm as counsel in the particular case.

(Emphasis added.)

 The district court's power to regulate attorney conduct derives from its inherent authority to supervise the conduct of attorneys who appear before it. *Richardson v. Hamilton International Corp.*, 469 F.2d 1382, 1385 (3d Cir.1972), *cert. denied*, 411 U.S. 986, 93 S.Ct. 2271, 36 L.Ed.2d 964 (1973). The court is required to exercise discretion and disqualify an attorney only when it determines, on the facts of a particular case, that disqualification is an appropriate means of enforcing the applicable rules. *United States v. Miller*, 624 F.2d 1198, 1201 (3d Cir.1980). The court should consider "the ends that the disciplinary rule is designed to serve and any countervailing policies, such as permitting a litigant to retain the counsel of his choice and enabling attorneys to practice without excessive restrictions." (*Id.*)

---

4. The Code of Professional Responsibility (revised 1985) adopted by this Court is the American Bar Association's Code of Professional Responsibility which was adopted, with certain modifications not applicable to the issues at bar, by the Supreme Court of the State of Delaware on March 22, 1971. That Code governs the conduct of attorneys appearing before this Court. L.R. 8(D)(2) (1985).

5. Pursuant to Disciplinary Rule 5–105(D), if a lawyer is required to withdraw from representation of a client, no partner, associate, or other lawyer associated with him or his firm may *continue to represent the client in this matter.*

6. The polestar of attorney conduct in this setting is Canon 5 which states that a lawyer should exercise independent and professional judgment on behalf of his client.

More importantly, motions to disqualify are often disguised attempts to divest opposing parties of their counsel of choice. "The attempt by an opposing party to disqualify the other side's lawyer must be viewed as a part of the tactics of an adversary proceeding. As such it demands judicial scrutiny to prevent literalism from possibly overcoming substantial justice to the parties." *J.P. Foley & Co., Inc. v. Vanderbilt,* 523 F.2d 1357, 1360 (2d Cir.1975) (Gurfein, J., concurring).

■ The focus of this present dispute is whether or not Joseph L. Alioto "ought to be called as a witness" for Kalmanovitz and therefore pursuant to DR 5–102(A) be disqualified from representing Kalmanovitz at trial. If so, this Court must then determine whether disqualification would impose such a substantial hardship upon Kalmanovitz that Mr. Alioto should not be disqualified even though he ought to testify. DR 5–101(B)(4). Because the defendants have brought this motion, they have the burden of establishing that Mr. Alioto's continuance in the case as counsel for plaintiffs would violate the disciplinary rules. *Brotherhood Ry. Carmen of United States and Canada v. Delpro Co.,* 549 F.Supp. 780, 787 (D.Del.1982); *MacArthur v. Bank of New York,* 524 F.Supp. 1205, 1209 (S.D.N.Y.1981); *Zions First National Bank v. United Health Clubs, Inc.,* 505 F.Supp. 138, 140 (E.D.Pa.1981).

■ The test for determining whether an attorney ought to testify was stated in *Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp., Inc.,* 546 F.2d 530 (3d Cir.1976), *cert. denied sub nom. Super Athletics Corp. v. Universal Athletic Sales Co.,* 430 U.S. 984, 97 S.Ct. 1681, 52 L.Ed.2d 378 (1977). There, the Court of Appeals for the Third Circuit mentioned in a footnote that the language of DR 5–102(A) suggests that a lawyer ought to testify on behalf of his client when he "has crucial information in his possession which must be divulged." 546 F.2d at 538–39 n. 21.

The defendants have pointed to three different events, all relating to the contracts in issue, where Joseph L. Alioto played an integral part and to which he has "crucial" firsthand information. The Court will consider these events *seriatim.*

## A. THE CRITICAL EVENTS

### 1. *The November 9, 1982 Milwaukee Meeting*

■ On November 9, 1982, Jacobs and Kalmanovitz met in Milwaukee to discuss, among other things, how to respond to the anticipated tender offer by Heileman. (D.I. 188 at 9.) Kalmanovitz and Jacobs discussed the possibility of JMSL raising its tender offer price (at that time the JMSL tender offer was $24 per share) with any additional financing to be provided by Kalmanovitz. (*Id.*) Present at that meeting were Irwin Jacobs, Kalmanovitz, Joseph Alioto and John Miller (an associate of Kalmanovitz). (D.I. 191 at 16; D.I. 190 at 6, fn. 4.) According to Mr. Jacobs, it was during this meeting that Jacobs first offered to pay Kalmanovitz 50% of any amount the Jacobs Group received for its Pabst shares over $24 a share should the Jacobs Group decide to sell its shares *"on the understanding* that Mr. Kalmanovitz not interfere with our efforts to sell our Pabst shares." (D.I. 129 at 5.)

Joseph L. Alioto testified at his deposition that the offer to pay Kalmanovitz 50% above the $24 per share had already been made prior to the November 9 meeting and that Alioto heard at the November 9, 1982 meeting that this was "in consideration of Kalmanovitz raising his money commitment from 25 million to about 45 million." (D.I. 191 at 16, 18.) In his deposition, Alioto stated that it was at this meeting that Jacobs suggested that the offer be put in writing. (*Id.* at 18.) Kalmanovitz, however, in his deposition testified that his recollection of the events that occurred at the November 9th meeting is not very clear:

Mr. Quinn-Q. Do you remember whether or not the subject matter of Kalmanovitz—that is, the idea that if the Jacobs group were to sell their shares, you would receive 50 percent of over $24— whether that subject matter was dis-

cussed at the dinner meeting in Milwaukee?

Mr. Kalmanovitz-A. If it did, went over my head. Once I have information, I store that. So anything said again, the same thing, I don't store that any more.

Mr. Quinn-Q. Do you remember whether or not at this time—this would have been, I think the record would show, November 9th, 1982—do you recall whether or not up until that point the subject matter of the splitting of 50 percent over $24 had been discussed or raised with you or any of your lawyers or representatives by Mr. Jacobs?

Mr. Kalmanovitz-A. That was discussed at the time when decision was made to increase the offer by Mr. Jacobs to larger amount and he didn't have money. *And the outcome of that discussion, which was handled by Mr. Alioto, as attorney representing me,* that agreement was entered.

(D.I. 192 at A–32; emphasis added.)

2. *The Drafting of the November 18, 1982 Letter and The San Francisco Meeting*

Mr. Alioto testified that between November 9th and November 18th, he drafted the language of the letter agreement from Jacobs to Kalmanovitz and dictated it to Irwin Jacobs' secretary. (D.I. 188 at 10; D.I. 191 at 25.) In addition, Alioto testified that he asked Jacobs' secretary to "send the letter." [7] (D.I. 191 at 25.) Afterwards, Alioto testified that he called Jacobs "a couple of times" to find out where the letter was and he was told that the letter was "in the mail." (*Id.*) Alioto testified that after he dictated the letter, he telexed a copy of the language contained in the November 18, 1982 letter to Jacobs. (*Id.* at 32.) Jacobs, on the other hand, testified at his deposition that he was not aware of any dictation by Alioto to either him or his secretary between November 9 and November 18, 1982, concerning the language of the November 18 agreement. (D.I. 192 at A–50.)

Alioto also testified that by November 17, 1982, he had dictated the language of the letter agreement to Kalmanovitz' secretary. (D.I. 191 at 38.) On November 17, 1982, Jacobs flew to San Francisco to meet with Kalmanovitz to discuss increasing the price of the JMSL offer. (D.I. 188 at 10.) Jacobs, however, had to wait to meet with Kalmanovitz because, according to Kalmanovitz, he would not meet with Jacobs until Kalmanovitz had received the letter agreement on Jacobs' letterhead, signed by Jacobs, representing Jacobs' commitment to pay Kalmanovitz 50% of anything above the $24 price. (D.I. 191 at 38; D.I. 192 at A–30.)

In addition to his testimony concerning the circumstances surrounding the preparation and signing of the November 18 letter, Alioto also testified that when he drafted the letter, he did not include the language concerning any "right of first refusal" because he "was not asked to draft into the language any right of first refusal." (D.I. 191 at 25–26.) Kalmanovitz, however, testified that it was his understanding that the November 18 letter provided him with a right of first refusal to purchase the Jacobs Group's Pabst shares in the event that the Jacobs Group decided to sell the shares. (D.I. 192 at A–34.)

3. *The Events of November 24–26, 1982*

After this Court denied the motions for preliminary injunctions against both the JMSL offer and the Heileman offer and Heileman's announcement that it would reduce the number of Pabst shares it would purchase, the Jacobs Group, Heileman and Pabst entered into a settlement agreement pursuant to which Heileman commenced a new tender offer and the Jacobs Group was paid $7.5 million for its costs and expenses. (D.I. 188 at 12.)

From the record to date, Mr. Alioto was a key participant in many of the relevant discussions and negotiations of this period. Alioto had a couple conversations with Irwin Jacobs concerning the Heileman an-

---

**7.** In his deposition, Alioto is not clear as to whom the letter should be sent. Apparently

Alioto wanted Jacobs to send the letter to Kalmanovitz. (*See* D.I. 191 at 25.)

nouncement and the decision of the Jacobs Group to support a new Heileman offer at a higher price. Alioto even testified that he attempted to persuade Irwin Jacobs and Steve Jacobs not to support the HBC offer. (D.I. 191 at 56, 57.)

Based upon a careful review of the record in this case, the Court is convinced that Mr. Alioto possesses intimate first-hand knowledge of the facts and circumstances underlying this action. Mr. Alioto participated in the discussions and negotiations surrounding the November 9th meeting. Of the four individuals who attended that meeting only Messrs. Jacobs and Alioto will be available to testify in person. (Kalmanovitz is too ill to appear[8] and John Miller is deceased.) Mr. Alioto can also testify concerning the purpose and intent as well as the method and date the alleged offer was made by Jacobs to pay Kalmanovitz 50% of anything above the $24 price.

Finally, with respect to the issue of whether Kalmanovitz breached his alleged oral collateral agreement with the Jacobs Group when he tried to prevent the Jacobs Group from selling its Pabst shares to Heileman, Mr. Alioto can relate with detail and familiarity, his role in the negotiations leading up to the November 26th agreement.

The disputes in this case are whether the Jacobs Group breached the November 18, 1982 agreement and whether Kalmanovitz breached an oral collateral agreement that he would not interfere with the efforts of the Jacobs Group to sell its Pabst shares. The discussions and negotiations concerning the events leading up to the drafting of the November 18 letter are relevant to the present case especially when there are dis-putes as to the meaning of the language in the letter.

For the above reasons,[9] the Court finds that Mr. Alioto possesses crucial information which should be divulged at trial. In light of the possibility that Kalmanovitz is too ill to testify in person, it becomes clear that Mr. Alioto ought to testify even if his testimony only corroborates the deposition testimony of Kalmanovitz. Unless it is merely cumulative, corroborative testimony should be utilized. *See MacArthur v. Bank of New York*, 524 F.Supp. 1205 (S.D. N.Y.1981) (counsel ought to testify to supply his own account of the events in question, even if corroborative); *Supreme Beef Processors v. American Consumer Industries, Inc.*, 441 F.Supp. 1064, 1068 (N.D. Tex.1977) (counsel should testify to corroborate client's story since client is entitled to "every scrap of favorable evidence that is essential to his case"); *United States ex rel. Sheldon Electric Co., Inc. v. Blackhawk Heating & Plumbing Co., Inc.*, 423 F.Supp. 486, 488 (S.D.N.Y.1976) (attorney ought to testify regarding negotiations even though principals were present).

■ With respect to plaintiffs' contention that Mr. Alioto will not be called as a witness for the plaintiffs, the issue to be determined by this Court is not whether he *will* testify but whether Mr. Alioto *ought to testify*. DR 5–102(B) states that an attorney should be disqualified when it is likely that the attorney *ought* to testify on behalf of his client. That the lawyer and his client decide that the lawyer need not testify is not controlling. Instead, the court must independently assess the situation. *Brotherhood Ry. Carmen of United*

---

**8.** At the final pretrial conference on March 22, 1985, Joseph L. Alioto represented that Mr. Kalmanovitz, although he is listed as a witness for the plaintiffs, is too ill to appear in person at the trial.

**9.** The record also indicates that Mr. Alioto "is apt to confuse his role as attorney with his role as witness...." *See Oliver B. Cannon & Son v. Fidelity and Casualty Co. of N.Y.*, C.A. 79–129 (D.Del. June 26, 1980) at 17. While taking the deposition of Irwin Jacobs, Mr. Alioto, on several occasions "testified" as to the witness' recol-lection of the facts. For example, Alioto would ask questions in the following manner:

Q. [By Alioto] Do you remember asking me what do I do if Heileman calls me?

A. [Jacobs] Mr. Alioto, I don't remember any such conversation.

Q. Okay. Do you remember my saying that you—apparently you don't, but let me complete the record. Do you remember my saying to you, "Don't call Heileman. You're in a very dangerous area?"

A. No, I do not remember any such thing. (D.I. 192 at A–64.)

*States and Canada v. Delpro Co.*, 549 F.Supp. 780, 789 (D.Del.1982).

In *MacArthur v. Bank of New York*, 524 F.Supp. at 1209, the court stated:

[T]he client [may not] waive the rule's protection by promising not to call the attorney as a witness. The ostensible paternalism of disregarding such waivers is justified by the circumstances in which the problem arises. The client will generally be reluctant to forego the assistance of familiar counsel or to incur the expense and inconvenience of retaining another lawyer. The most serious breaches of the rule, in which an attorney has become intimately involved in the subject matter of the dispute, will often be the very situations in which withdrawal is most burdensome. Moreover, the party will generally be guided in its decision by the very attorney whose continued representation is at issue. At the same time, the attorney will be reluctant to jeopardize good relations with the client and may—against his better judgment—defer to the client's desire for representation.

Finally, "[i]f there is any doubt as to whether an attorney ought to testify, that doubt must be resolved in favor of testimony and against representation." *Oliver B. Cannon & Son, Inc. v. Fidelity and Casualty Co. of N.Y.*, C.A. 79–129 (D.Del. June 26, 1980) at 3.

### B. SUBSTANTIAL HARDSHIP

Having found that Mr. Alioto ought to testify on behalf of Kalmanovitz, the Court must now decide whether disqualification would impose such a substantial hardship upon Kalmanovitz that Mr. Alioto should not be disqualified even though he ought to testify. DR 5–101(B)(4). Plaintiffs argue that his firm has spent a great deal of time and resources in preparing this case which arose out of a "protracted fight" for control of Pabst. Therefore, plaintiffs contend, disqualification of Mr. Alioto and his firm "would work a substantial hardship on the plaintiffs due to the distinctive value of counsel in this case and his well-known expertise in commercial litigation." (D.I.

193 at 12–13.) The Court, however, does not find these arguments persuasive.

■ The mere fact that an attorney has "spent great time and resources in preparing for the case" is insufficient to bring him within the "substantial hardship" exception. *See Universal Athletic Sales Co. v. American Gym, Recreational & Athletic Equipment Corp.*, 546 F.2d at 538–39 n. 21. The possibility of delay while a new attorney is retained also does not fall within the ambit of the hardship anticipated by the Rule. *Teleprompter of Erie, Inc. v. City of Erie*, 573 F.Supp. 963, 966 (W.D.Pa. 1983). In *MacArthur v. Bank of New York*, 524 F.Supp. at 1210, the court recognized that "if the expense and delay routinely incident to disqualification satisfied the substantial hardship exception, that exception would soon swallow the rule."

## II. MOTION FOR JURY TRIAL

On January 14, 1983, Kalmanovitz commenced this breach of contract action against the Jacobs Group in the Superior Court of the State of California for the County of Marin. (D.I. 41.) Kalmanovitz did not at any time demand a jury in that action. On February 14, 1983, the California state action was removed to the United States District Court for the Northern District of California. On April 26, 1983, the removed action was consolidated with an antitrust and tortious interference with contract action commenced on January 14, 1983, by Kalmanovitz in the United States District Court for the Northern District of California against the Jacobs Group, Heileman, Russell G. Cleary ("Cleary"), Chief Executive Officer of Heileman, HBC, a wholly-owned subsidiary of Heileman, Pabst, and William Smith ("Smith"), President and Director of Pabst. Kalmanovitz had demanded a jury in the California federal antitrust action. The consolidated action was transferred to this Court and was consolidated with an action commenced on December 10, 1982, by Kalmanovitz and S & P Co., a California corporation, against Heileman, Cleary, HBC, Pabst and Smith. (D.I. 40.) Kalmanovitz had not demanded a

jury in the Delaware federal securities action. On May 12, 1983, the Jacobs Group served its answer in the breach of contract action in which it denied any liability and asserted a counterclaim seeking a declaratory judgment that the Jacobs Group did not breach the alleged contract. (D.I. 112.)

On November 21, 1983, this Court dismissed the antitrust and tortious interference claims against the Jacobs Group and the other defendants. (D.I. 138.) A Final Order of Dismissal was entered on September 28, 1984, with regard to all the claims as to all defendants (except for the breach of contract claim against the Jacobs Group). (D.I. 172.) Plaintiffs appealed to the United States Court of Appeals for the Third Circuit with respect to the dismissal of these claims. (D.I. 173.) The appeal is still pending.

On October 22, 1984, Kalmanovitz moved for a separate trial date on the instant contract claims. (D.I. 175.) The motion was granted; trial was set for August 12, 1985. At the final pretrial conference on March 22, 1985, the Court noted that no demand had been made by any party for a jury trial in the breach of contract action. Plaintiffs then moved this Court for a jury trial on the breach of contract issue. (D.I. 186.)

The plaintiffs' argument is two-pronged. First, the plaintiffs argue that they have not waived their right to a jury trial on the breach of contract issue because a demand for a jury trial was made in the California federal court action (antitrust and tortious interference with contract action) prior to the consolidation and transfer of those cases to this Court. Therefore, the jury trial demand, after consolidation, extends to each of the three consolidated cases. (D.I. 187.) Second, the plaintiffs contend that should this Court find that plaintiffs

waived their right to a trial by jury, pursuant to Fed.R.Civ.P. 39(b), they are entitled to relief from the waiver.

## A. WAIVER

■ Where a civil action is removed to the federal district court before all the necessary pleadings have been served,[10] Fed. R.Civ.P. 38, governing jury demands in ordinary federal civil actions, is applicable. *McRae v. Arabian American Oil Co.*, 34 F.R.D. 513 (S.D.N.Y.1964).[11] The requirements of Rule 38(b) state that a demand for a jury trial of any issue triable of right by a jury must be made by serving upon the other parties "at any time after the commencement of the action *but not later than 10 days after the service of the last pleading directed to such issue.*" (Emphasis added.) Failure to serve a demand within that period constitutes a waiver of trial by jury. Fed.R.Civ.P. 38(d).

■ The last pleading in this consolidated case on the breach of contract issue was filed with the Court on January 23, 1984. (D.I. 153—Plaintiffs' reply to counterclaims of Jacobs Group.) The demand for the jury trial was not made by plaintiffs until the final pretrial conference, March 22, 1985. (D.I. 184.) Obviously, the demand for a jury trial was not made within the period set forth in Rule 38(b) and therefore plaintiffs have waived their right to trial by jury.

The plaintiffs, nevertheless, argue that because a jury trial was demanded in the California federal court action, under Rule 42(a), the demand extends to each of the three cases which were consolidated. The Court, however, disagrees.

In consolidated actions, "the parties and pleadings in one action do not automatical-

---

10. The Jacobs Group did not serve its answer and counterclaim in the breach of contract action until May 12, 1983. (D.I. 112.) The California state court case had been removed to the Northern District of California on February 14, 1983.

11. In their Memorandum of Points and Authorities in Opposition to Plaintiffs' Motion For Jury Trial, the defendants argue that Fed.R.Civ.P.

81(c) controls actions removed from state courts to federal courts. While the defendants are correct that Rule 81(c) applies to removal cases, the defendants have failed to note that the rule only applies: "If at the time of removal *all necessary pleadings have been served....*" Because the answer to the complaint and the counterclaim were not served prior to the date of removal, Rule 81(c) does not apply.

ly become parties and pleadings in the other action." J. Moore, J. Lucas & J. Wicher, 5 Moore's Federal Practice ¶ 42.04[3] at 42–28 to 42–29 (2d ed. 1985); *In re Massachusetts Helicopter Airlines, Inc.*, 469 F.2d 439, 441–42 (1st Cir.1972). "[C]onsolidation is permitted as a matter of convenience and economy in administration, but does not merge the suits into a single cause, or change the rights of the parties, or make those who are parties in one suit parties in another." *Johnson v. Manhattan Railway Co.*, 289 U.S. 479, 496–97, 53 S.Ct. 721, 727–28, 77 L.Ed. 1331 (1933). However, the Court of Appeals for the Third Circuit has held that "absent consolidation for all purposes of cases separately filed, each civil action is to be viewed as a separate unit." *Bogosian v. Gulf Oil Corp.*, 561 F.2d 434, 441 (3d Cir.1977), *cert. denied*, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978).

 Although the three actions were at one time consolidated for all purposes, all the claims other than the contract claims have been dismissed. These dismissals are presently on appeal. This Court granted plaintiffs' motion for a separate trial rather than await the outcome of those appeals. As a result, the contract action is no longer consolidated with the other actions. On the grounds that the contract claims are distinct, plaintiffs have sought a separate trial while their appeal of this Court's dismissal of the antitrust, securities and pendent state claims is pending. Consolidation, therefore, did not cure the waiver of the jury trial.

## B. RELIEF UNDER RULE 39(b)

Plaintiffs next argue that if this Court should determine that plaintiffs have waived their right to a jury trial, the plaintiffs are nevertheless entitled to relief pursuant to Fed.R.Civ.P. 39(b). That rule states:

[i]ssues not demanded for trial by jury as provided in Rule 38 shall be tried by the Court; but, notwithstanding the failure of a party to demand a jury in an action in which such a demand might have been made of right, the court *in its discretion*

upon motion may order a trial by a jury of any or all issues. (emphasis added)

 The exercise of discretion contemplated by Rule 39(b) must be based upon circumstances warranting its exercise lest discretion become a mere arbitrary act of the court. *State of Delaware v. Massachusetts Bonding & Ins. Co.*, 3 F.R.D. 65, 67 (D.Del.1942). Each application for relief pursuant to Rule 39, therefore, must be examined in light of the facts of that particular case.

A timely demand for a jury trial was not made in this case which was filed in January of 1983. In fact, no demand for a jury trial was made until the final pretrial conference in March of 1985. The reason given by counsel for plaintiffs, when at that pretrial conference the Court *sua sponte* raised this issue, was either oversight or mistake. Apparently when the case was filed in the California state court, counsel for plaintiffs or someone from his office failed to make the appropriate demand.

 "[M]ere inadvertence, oversight or lack of diligence on the part of counsel is not sufficient ground to evoke relief under Rule 39(b)." *Biesenkamp v. Atlantic Richfield Co.*, 70 F.R.D. 365, 366 (E.D.Pa. 1976) (plaintiff made his demand for jury trial on papers filed with the court but not on papers served on defendants). This is especially true when experienced trial counsel are involved. *See Canister Co. v. National Can Corp.*, 8 F.R.D. 408 (D.Del. 1948); *State of Delaware v. Massachusetts Bonding & Ins. Co.*, 3 F.R.D. 65 (D.Del. 1942).

In *Noonan v. Cunard Steamship Co.*, 375 F.2d 69, 70 (2d Cir.1967), Judge Friendly stated: "The effect of such a continued and consistent course of decision [eighteen reported decisions by district courts within the Second Circuit holding that mere inadvertence in failing to make a timely jury demand does not warrant relief under Rule 39(b)] is to narrow the allowable scope of discretion; the area open to the judge's discretion has shrunk to determining whether the moving party's showing *beyond* mere inadvertence is sufficient to

justify relief." *See also Todd v. Lutz*, 64 F.R.D. 150, 151 (W.D.Pa.1974) (court would not grant relief under Rule 39(b) due to counsel's inadvertence); *Ridge Theatre Corp. v. United Artists Corp.*, 27 F.R.D. 8 (E.D.Pa.1961) (court would not exercise its discretion to grant relief because of counsel's oversight). *See also Wall v. National Railroad Passenger Corp.*, 718 F.2d 906 (9th Cir.1983) (district court correctly concluded that only checking the jury demand box on the civil cover sheet without serving demand on defendant was inexcusable waiver by plaintiff). Finally, in *Lewis v. Time*, 710 F.2d 549 (9th Cir.1983), the plaintiff failed to request a jury trial before his case was removed from the California state court.[12] The court of appeals found that the trial court did not abuse its narrow discretion pursuant to Rule 39(b) when the district court denied relief to plaintiff due to his counsel's oversight or inadvertence.

■ In determining whether or not to grant the relief requested by Kalmanovitz pursuant to Rule 39(b), the Court may also consider the type of case involved and the factual issues to be decided at trial. *Ridge Theatre Corp. v. United Artists Corp.*, 27 F.R.D. 8 (E.D.Pa.1961). The issue therefore becomes whether the questions presented could be better tried by the court sitting alone or with a jury. In *Bullock v. Sterling Drug, Inc.*, 8 F.R.D. 575 (E.D.Pa. 1948), the court, in a contract action, was confronted with this issue after the time for demanding a jury trial had expired. The only reason given for the failure to make demand was an oversight on counsel's part. Because the issues to be determined at trial involved whether a contract existed and if so, what were its terms regarding severance pay, the court held that neither of the issues was suitable for a jury trial rather than a trial to the court alone.

■ In the present action, the alleged breach of contract claims arise out of the fierce battle for control of Pabst. Apparently there will be extensive testimony concerning what Jacobs and Kalmanovitz

meant by their contract, as well as detailed testimony concerning the joint efforts made by Kalmanovitz and the Jacobs Group to acquire Pabst. Additionally, this case involves complex facts and rules concerning federal securities laws, e.g., proration pools, withdrawal of tender offers, and shareholders rights.

Based on the above setting, this Court finds that these issues involving alleged breaches of contract should be tried to the Court and not to the jury. Therefore, the Court will deny Kalmanovitz's motion for a jury trial.

An order will be entered in accordance with this Opinion.

---

12. The court noted that under California law, a litigant waives trial by jury by, *inter alia,* failing to "announce that one is required" when the trial is set. *Citing* Cal.Civ.Proc.Code §§ 631, 631.01 (West 1982 Supp). 710 F.2d at 556.